Good morning, Your Honor. May it please the Court. This case is one of first impression, and it's about one word in the Fourth Amendment, particularly. That word was included for a The shot spotter does not give a particular reasonable suspicion to stop anyone in a particular area. In this case, there was no description of a vehicle, no make, model, color of the vehicle given, no traffic violations or unusual behavior by Mr. Rickmon or the vehicle in which he was riding. So could I ask you, Mr. Cass, what they do seem to have is they have both the first shot spotter report and then through the chain, Officer Elfritz learns about the 911 call. So that at least does get transferred. I think there's some other issues that collective knowledge is problematic for, but he finds out about the 911 call. It's all in this little two-block street that exists in Peoria, not very long. It's got nothing at one end and it tees into another street at the other end with another street in the middle. And it's 440, 445 in the morning. So is it enough to stop a car when you know you have shots fired in a pretty particularized area? I wouldn't nail it down to one house or the other, but they know that this is the street. They're told this is the street. Shots fired, and not very many other people are on the road given the time of day. So you see a car coming towards you. Is that enough? When you, as you just pointed out, you don't know what kind of car you're looking for. You don't know a lot of other details. Can you stop that car on the basis of reasonable suspicion that the people in that car might have been responsible for the shots? No, Your Honor, I think you need more than that. Simply being in an area is insufficient. And that's the notoriously, we hear this all the time, high crime area. High crime area, and just if we can address to that point, Officer Ellifritz said it's actually not unusual for a number of cars to be on the road at 4 a.m. That's when the nightclubs close in Peoria. You're right, though. It was the only car on that particular block. We would dispute that this is a high crime area. Officer Ellifritz was vague on that. He said he responded to the general area of North Ellis on occasion. We have no idea how big that area is. For all we know, that's the entire town of Peoria is a high crime area. That's what he does for a living. At times on North Ellis. So we would submit that his subjective view is insufficient to make it a high crime area. And by the way, we never hear that term until the government's briefing. That's never mentioned in the record below. And that's the key distinction between this case and Brewer and Burgess. We have closer in time and more particularity. In Brewer, we have a white SUV coming out of a housing project a second later after shots are fired and it stopped at a point. In Burgess, we have a particular location on the street. We have a black vehicle. Not too much particularity, but definitely more than we have here. Here we have none of that. We just have black male on foot, cars leaving. Five minutes later, we see Mr. Rickman's car. And the dash cam video shows this very clearly. As soon as he gets to the end of the block, you can see the kind of the headlights are perpendicular as they're turning on to the street. Opposite side, by the way, of where the shots occurred. And immediately, the lights go on. There's no way he had any particular facts about that vehicle, its occupants, or any sort of nexus. And I think you need that. Reasonable suspicion is not a high standard, but you need something. You need a color of a vehicle or some sort of suspicious behavior, furtive movement, something. And it's just not present in the facts of this case. Well, more detail on the 911 call might have done. I mean, the call could have come from somebody in that area for all we know. Sure. Sure, Your Honor. And especially if they said, listen, it's a gray car. That one's pretty much like Burgess in that case. It's a gray car exiting. The district court made two significant errors that I'd like to just briefly touch on. It's well settled in Odom. The district court cannot use facts that occur after the stop. It that snapshot of what the officer sees at that moment. We would submit, according to dash cam videos, when he sees the headlights, he makes that decision. So the district court certainly can't rely, I would assume you're arguing, on the fact that after the stop happens, it turns out that Rickman himself has a gunshot wound. Right. That should not be. Because he didn't know that when he stopped the car. That's right. And as well as the, you know, there's a lot made of this rolling back, Your Honor. Officer Ellefrit said they were not trying to evade. They were complying with his commands. So it seems unusual for the district court then just to take that testimony, that he's not threatened by it, it's not suspicious in and of itself, and then use it as a basis for reasonable suspicion in the order. It actually cites to a seven-story case called Chapman, which involves a high-speed chase after a bank robbery. It's an opposite. And just the district court found it was justified for investigative reasons to ascertain whether it contained victims or witnesses. That's clearly prohibited in Bowman, where the court wrote that stopping a car for identification purposes is deliberate enough to justify suppression. Your argument is you have to have reasonable suspicion about that car, and that if you're going to do witnesses, you've got to comply with Edmonds or, you know, something along those lines. Precisely. But the district court found it was okay for investigative reasons to identify witnesses or victims, and Officer Ellefrit's actually said... You can stop any car you want to in period. Precisely, in order to investigate. And that's unconstitutional under the Fourth Amendment. The district court was very bothered, though. I mean, here's Ellefrit's, you know, he hears about the shots, here's this one car, and he understood you to be saying that it was the officer's duty to just let the car go. Well, it's not that... I agree, Your Honor. Following the car meant you should have let the car go. And it's not... seems like a radical notion at first blush, but that's exactly what the officers did in Brewer. It doesn't mean you couldn't pursue them, get the license plate number, call in some backup, and maybe garner some of that reasonable suspicion, some of those suspicious facts. But yeah, they should have let it go. I notice I'm almost eating into my rebuttal time. You are welcome to... The car that stopped is the only car on the street, right? That's right, Your Honor. But again, it was five minutes, 20 seconds later, and it was closer in time in Brewer, a matter of seconds. And even in Burgess, I think it was two or three minutes, and they were already a half mile away. Okay. Mr. Simpson. Good morning, Your Honors. May it please the court, I'm Scott Simpson on behalf of the United States. The ultimate issue here, and this was alluded to by Judge Wood at the beginning of my opponent's argument, the ultimate issue here is whether the police can stop the only car that they see leaving the scene of multiple gunshots by the only route of egress from that scene in a high crime neighborhood at 4.40 a.m. just a few minutes after the fire. I mean, that's it. That's all they have. They don't have any other information about who's in the car. So you have to somehow say that's enough to create reasonable suspicion that one or more occupants of the car has committed a crime. Exactly, Your Honor. And the government's brief dances around quite a few other things that I think are not helpful. The only collective knowledge you have is the conveying of the 911 call through the dispatcher to Officer Elifritz. Yes, Your Honor. If I could address a little bit of that 911 call, and actually there was a, I think, a misstatement, a misunderstanding during defense counsel's argument in relation to the 911 call. What caused Officer Elifritz initially to start moving toward this scene was the shot spotter. He gets two hits on the shot spotter. Correct. And while Officer Elifritz was en route to that scene, the dispatcher reported that she was getting calls about the same incident. Now, part of the record here is the audio of that actual 911 call. The 911 caller says he is at 2227 Ellis Street. That is actually halfway between the scene at the bottom of North Ellis and Archer, which is that perpendicular street that crosses across. But is that information conveyed to Elifritz? See, here's the issue. I am all happy with collective knowledge if you call Judge Flom and tell him shots are at this at 2203 North Ellis or wherever, and then Judge Flom tells me the same thing. It's just relayed among us. But collective knowledge doesn't mean things that are only in your head that you do not convey to the intermediary person, because I'm not relying on it if I never learned about it. I'm you if it moves all the way through the system. But I'm not sure that that information on the full transcript of the 911 was what Officer Elifritz got. I think he just got a summary from the dispatcher. If you look, I understand what you're saying, Your Honor. If you look at the Government's Exhibit 5, that's the transcript of the exchanges between dispatch and the officers here, what dispatch did convey, so again, Officer Elifritz is on route. Right, he's on route because of a spot shutter. I get that. Because of reports of gunfire, and the dispatcher gets additional reports of gunfire. Right, from 911. And the dispatcher during that whole process conveys to Officer Elifritz, cars on route to Ellis, there's several cars leaving, last seen going northbound and so forth, and then a few minutes later, there's also a black male on foot who ran northbound towards McClure and so forth. I can see no reason... Which this car isn't going to help much about because the black male on foot running toward McClure was long gone by the time the five minutes passed. Correct. This is a teeny little street. I think, Your Honor, though, here's the core of our response to that. I think Officer Elifritz could infer that the dispatcher was not simply conveying calls about some cars. Would a 911 caller call 911 simply because there are cars on the street? Not at all, but it is the address. You're trying to get more specificity out of this call. I see it as corroborating to go to that area, he gets the spot shutter report, and then he's told that the 911 calls are coming in. So great, keep driving, go over there. I don't think there's any question about that, but I don't think any detail in the 911 call that is not relayed along to Officer Elifritz is not anything we can use. I would disagree with one small aspect of that, Your Honor. I don't think we can use the fact that the caller was calling from 2227 Ellis, correct. I think we can infer that Officer Elifritz would believe the caller, the dispatcher is reporting 911 calls. Surely no one is going to call simply about cars on the street. Surely no one is going to call. So are you conceding that the 911, I'm just replaying in my mind what you just read. So I thought then when the dispatcher contacted Officer Elifritz, the dispatcher went so far as to say we're getting a 911 call about shots fired. Does the dispatcher ever say that? She did not. She does not. So that's actually even worse than I thought. However, Your Honor, our point is that Officer Elifritz could infer that the reason for those 911 calls. You're kidding. In fact, the only reason for the 911 calls would be the shots fired. Why in the world? I mean, there are domestic violence calls on 911. There are, you know, all sorts. There are fires that people call about 911. Is shots the only thing the Peoria 911 service receives? No, certainly not. Of course not. But I can't imagine Officer Elifritz thinking, oh, someone is calling about cars on the street. There were no other cars on this particular street moving. It was a drug deal. I mean, honestly, you guys have been here before us in all of the things I've just mentioned. You know, there are a bunch of people on the street in a deserted place, you know, and they're exchanging a kilo of, you know, heroin. But the callers didn't say that. Of course not. But I'm saying how does Officer Elifritz know it's the same calls that the spot service, whatever it is, spot shotter service has as opposed to any of these other reasons? Because he doesn't know. Because he's heading. He's just guessing. This is pure speculation. Because he's heading for North Ellis because of shots fired. The dispatcher knows he's heading to North Ellis because of shots fired. The dispatcher is conveying additional information that the dispatcher has received knowing that Officer Elifritz knows that there are shots fired. I'm sorry. Why doesn't the dispatcher just say, you know, we know spot shotters told you there are shots fired, and now we've got a 911 caller saying the same thing? I don't know that, Your Honor. Presumably because the dispatcher knew Officer Elifritz knew that. If I could just, Your Honor, go to a few other areas, a few other issues that the defense has raised here, if I could. They argue about the nature of the area. They argue that there's no evidence that it's a high crime area. But the only evidence that we have in the record about the nature of the area was Officer Elifritz's testimony that he had worked the nighttime shift for the Peoria Police Department for four and a half years, and that he responded to reports of crime, including gunfire. And it was more than just that general area. He actually said, if I could refer the court to page 16 of the suppression hearing, the question is, have you responded to this area for reports of gunfire before? I have, he said, Officer Elifritz. How often were you traveling over roughly into District 11, the area of North Ellis, to respond to reports of crime in this general area? He says, within a couple block radius, I would say maybe once a night, maybe at most. A couple block radius of District 11 or a couple block radius of Ellis? What it seems to indicate, Your Honor, is a couple of block radius of North Ellis. Why do you say that? Because when you just now read it, the first question that popped into my mind are what are the boundaries of District 11? Because, I mean, I worry about this a lot because this high-crime area business seems to target low-income minority neighborhoods in a very disturbing way. Maybe there's violence there, you know, but I think we need to be careful about that. I understand that, Your Honor. I see that I have less than a minute. If I could just add one more point. Sure. Um, the defense says that we are improperly relying on facts that occurred after the stop, and we don't want to do that, and we are not doing that. I did want to point out, though, in relation to the passage of time, the District Court found, as a matter of fact, and of course, this Court accords to that finding of fact by the District Court, unless it's clearly erroneous, the District Court found that from dispatch to the stop of the vehicle was three and a half minutes. And the defense says, well, that's too long. They say that, well, surely someone involved in a shooting in a residential neighborhood is going to leave the area long before that. Well, it would be very easy to leave that area because there's this big parking lot of that state facility right south of it, right? Except that there's a strip of vegetation between the end of North Ellis and that parking lot. That is, that is very much a dead end. The only way to get out of that area where the gunshots were. No, but on foot. A shooter on foot could easily cross the strip of vegetation, be in the parking lot and out. Correct. Three minutes. Correct. But again, we don't want to rely on facts that occurred afterwards, but as it turned out, the defendant had been involved in that shooting. But that's not, I mean, we really honestly can't do it that way. Correct. If hindsight were the standard for the Fourth Amendment, I can guarantee you a great number of cases would come out differently. I understand that, Your Honor. But what we're saying is that three and a half minutes, our point is, three and a half minutes is not too long to find a car that was involved in those shots. If you know that there's a car involved in them at all, of course, spot shot or the 911 person doesn't have any idea whether it's shots fired from the front porch where you're not in a car at all, or whether it's shots fired from a vehicle, or whether somebody fired shots on the ground and then jumped into a vehicle. Actually, it's as specific as I understand to backyard and front yard. The initial report was backyard. Right. In other words, it's not specific as to inside a vehicle or not. Correct. Correct, Your Honor. But one final point on the fact that Mr. Rickman had been injured in that shooting. Again, we're not relying on that for the stop. We're relying on that to say that three and a half minutes is not too long. This case is all about the stop. It really, I think, it fully turns on the stop. But I think we need to consider the fact in saying that three and a half minutes is not too long, Mr. Rickman had been involved, as a matter of fact, it turned out he had been in that shooting. Thank you very much. Thank you, Your Honor. Mr. Cass, anything further? Be very, very brief. We say five minutes because Officer Ellifritz gets the alert in his vehicle at 4.40 a.m. He's already deciding to go to North Ellis Street, arrives there at 4.45. That's where we got the 45 minutes. The clock starts according to the court and the government from the call. But the 911 call adds no more particularity to these facts. He was already on his way. And it's kind of the same reason. The spot shotter comes directly to his squad car, right? Yes, he has a computer, Your Honor, that indicates. So he doesn't need the intermediary of the dispatcher for that. And on collective knowledge, no one in law enforcement had the necessary level of reasonable suspicion. And he didn't rely on anyone. He said he was going to stop anyone in the general area. So I think it's a little bit of a red herring, the collective knowledge on that. And just two final points. Judge Flanagan, you had mentioned before about they were the only car on the road. We're not conceding it is a high crime area. But even if it was, according to Oglesby, just being there would be insufficient. I just wanted to mention that. Would you consider that he received an emergency report? Would you label it when he received an emergency report? No, Your Honor. Because if you do, if you do, I don't want to put words in your mouth. If you do, we have allowed less than corroborating, the sufficient corroborating support in other cases. I guess I'd have to think a little bit more about that, Your Honor. I haven't briefed that. We know that in Brewer, they talk about, you know, there's a little bit of leeway for gunfire being different. But that's a big difference between Brewer and... We did that in United States v. Williams, too. Right. If the court would like us to brief that, we're happy to follow up with the... I think we're okay. We'll send an order if we need something. And just the last point, in summation, you know, the case appears to be a straightforward, you know, traffic stop. But the implications of it are serious for those living in actual high crime areas or near shot spot or alerts. Think of the... It's an astounding statement. I'm sure Officer Elliverts is a fine public servant, but it's an astounding statement. I would stop anyone in the area, a parishioner, a club patron, anybody. He doesn't have that unbridled discretion. That's disturbing. Under his view, all 15 people at the end of that block could have been stopped, could have been questioned in that... Well, Ibarra would put some real shade on that, I think. Right. Yeah. All right. Thank you very much. And you accepted an appointment from us, as I understand. Yes, Your Honor. We thank you very much for your service to the court, to your client. Thanks as well to the government. We'll take the case under advisement.